Trenton R. Kashima (SBN 291405)
**BRYSON HARRIS SUCIU & DEMAY PLLC**
19800 MacArthur Blvd., Suite 270
Irvine, CA 92612
Telephone: (212) 946-9389
tkashima@brysonpllc.com

*Attorneys for Plaintiffs and the Proposed Class*

[Additional Counsel Listed on Signature Page]

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

**KORTNIE PITCHFORD** and **DWAN BELL**, individually and on behalf of those similarly situated,

Plaintiffs,

v.

**CAMDEN PROPERTY TRUST**, a Texas real estate investment trust, **CAMDEN DEVELOPMENT, INC.**, a Delaware corporation,

Defendants.

Case No.: 5:26-cv-03226

**FIRST AMENDED CLASS ACTION COMPLAINT FOR:**

1. **VIOLATIONS OF THE CONSUMER LEGAL REMEDIES ACT;**
2. **VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW;**
3. **VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW;**
4. **RESTITUTION BASED ON QUASI-CONTRACT; and**
5. **DECLARATORY RELIEF.**

**JURY TRIAL DEMAND**

Plaintiff Kortnie Pitchford ("Plaintiff Pitchford") and Plaintiff Dwan Bell ("Plaintiff Bell") (collectively, "Plaintiffs"), by and through their counsel, bring this first amended class action complaint against Defendant Camden Property Trust ("Camden Trust") and Defendant Camden Development, Inc. ("Camden Development") (collectively, "Camden" or "Defendants") for deceptively advertising apartment rental prices that exclude mandatory fees consumers must pay to obtain the advertised apartment and associated services.

## NATURE OF THE ACTION

1. This is a consumer protection action arising from Camden's practice of advertising apartment rental prices that exclude mandatory recurring service charges that consumers are required to pay for as a condition of tenancy (referred to herein as "Mandatory Service Charges," as defined below).

2. By advertising one rental price to consumers and later imposing additional unavoidable Mandatory Service Charges, Camden causes its apartments to appear less expensive than they actually are and deprives consumers of the ability to accurately compare housing options.

3. Housing is one of the most significant expenses consumers incur. Prospective tenants routinely compare apartment communities based on advertised monthly rent when deciding where to live, and even relatively small differences in advertised price can influence whether a consumer pursues a property, schedules a tour, submits an application, or enters into a lease.

4. Camden is a highly successful corporate landlord responsible for housing thousands of California renters across more than a dozen apartment complexes throughout the state. Through its camdenliving.com (the "Website"), Camden advertises apartment units, markets rentals to consumers, and facilitates the leasing process for prospective tenants.

5. California is home to nearly six million rental households, and more than one in four California renters live in large corporate apartment complexes—

the highest rate in the nation. In fact, California alone accounts for roughly fifteen percent of the country's 11.4 million tenants residing in large apartment communities. As a result, the pricing practices of large corporate landlords like Camden have a substantial impact on California consumers.

6. Camden competes for tenants by prominently advertising attractive monthly rent prices designed to entice prospective tenants. But the prices Camden advertises are not the true prices consumers are required to pay. Instead, Camden draws renters in with artificially low advertised rents while concealing mandatory monthly service charges that materially increase the actual cost of the apartment.

7. Price transparency is a cornerstone of consumer protection law. Consumers are entitled to know the true cost of a product or service before making a purchasing decision, and businesses that advertise deceptively low prices undermine consumers' ability to comparison shop and make informed decisions. Recognizing these concerns, California has enacted some of the nation's strongest consumer-protection laws requiring businesses to disclose mandatory fees and charges upfront.

8. Camden's pricing practices run contrary to longstanding consumer protection principles that prohibit deceptive and misleading advertising. Legislatures, regulators, and courts have long recognized that businesses should not be permitted to attract consumers with artificially low advertised prices only to later impose mandatory charges that increase the true cost of the transaction.

9. In January 2025, the Federal Trade Commission ("FTC") brought an enforcement action against Greystar Real Estate Partners, LLC for the identical drip-pricing conduct in apartment rentals, resulting in a $24 million settlement. On December 8, 2025, the FTC published industry-wide guidance warning all property managers that "advertising a rental price that excludes mandatory charges is a violation of the law." Despite this enforcement action and explicit regulatory guidance, Camden has continued to engage in the same unlawful conduct.

10. Camden's pricing practices violate numerous California consumer protection statutes designed to prevent deceptive and misleading business practices.

11. Nevertheless, Camden continues to advertise rental prices that exclude the Mandatory Service Charges that consumers are required to purchase. Consumers are drawn in by the advertised rent, only to later discover the advertised rents that were never actually available. Unavoidable Mandatory Service Charges, including "Technology Package," "Systematic Code Enforcement Program," and "Front Door Trash Pickup" fees, routinely increase the true monthly cost of an apartment by more than $100.

12. By excluding Mandatory Service Charges from the advertised price of its apartments, Camden creates the false impression that its units are more affordable than they truly are, distorts consumers' ability to compare competing housing options, and gains an unfair competitive advantage over landlords that accurately disclose the full cost of the integrated transaction, meaning Camden’s single consumer transaction through which a prospective tenant obtains a residential leasehold and is simultaneously required to purchase separately identified and separately priced services.

13. As a direct and proximate result of Camden's unlawful, unfair, and deceptive pricing practices, Plaintiffs suffered injury and damages and seek all relief available under applicable law.

**PARTIES**

14. Plaintiff Kortnie Pitchford is an individual citizen of the State of California and natural adult person who resides in Ontario, California.

15. Plaintiff Pitchford entered into a lease agreement for Camden’s “Camden Landmark” community located in Ontario, California, and has paid, and continues to pay, rent and other fees to Camden as described herein pursuant to that lease.

16. Plaintiff Dwan Bell is an individual citizen of the State of California and natural adult person who resides in Long Beach, California.

17. Plaintiff Bell entered into a lease agreement for Camden's "Camden Harbor View" community located in Long Beach, California, and has paid rent and other fees to Camden as described herein pursuant to that lease.

18. Plaintiff Bell continues to rent in an area where Camden operates at least five Camden apartment communities, anticipates continuing to rent for the immediate and foreseeable future, and very well may need to rent from Camden in the future.

19. Defendant Camden Property Trust is a real estate investment trust organized under the laws of the State of Texas with its principal place of business located at 2800 Post Oak Boulevard, Suite 2700, Houston, Texas 77056.

20. Camden Property Trust was formed on May 25, 1993, and its common shares of beneficial interest are publicly traded on the New York Stock Exchange under the ticker symbol "CPT."

21. Defendant Camden Property Trust is a publicly traded real estate investment trust (NYSE: CPT) that, as of December 31, 2025, owned interests in, operated, or was developing 175 multifamily properties comprising 59,921 apartment homes across the United States.[1]

22. Camden Property Trust and its consolidated subsidiaries generated approximately $1.57 billion in property revenues in 2025, held approximately $13.6 billion in real estate assets, and employed approximately 1,640 people, including executive, community, and administrative personnel.

23. In California, Camden Property Trust operates eleven large apartment communities—five in the Los Angeles/Orange County market and six in the San

[1] Camden Property Trust 2025 Form 10-K, https://s28.q4cdn.com/425223795/files/doc_financials/2025/ar/30f20141-d8ac-424f-8686-32c462fc5b90.pdf (Last visited: September 1, 2026).

Diego/Inland Empire market—totaling approximately 3,609 rental units.

24. Camden Property Trust and its consolidated subsidiaries are "primarily engaged in the ownership, management, development, reposition, redevelopment, acquisition, and construction of multifamily apartment communities," as stated in Camden's 2025 Form 10-K. Camden Property Trust operates all of its apartment communities under the unified "Camden" brand through its centralized website, camdenliving.com.

25. All advertising, pricing strategies, fee and service charge structures, lease terms, and operational policies are established, controlled, and directed by Camden Property Trust at the corporate level. Camden Property Trust holds itself out to the public, investors, and regulators as the entity that "owns and operates" its apartment communities, as reflected in its SEC filings, investor presentations, and public statements.

26. Camden Property Trust's significant subsidiaries include Camden Operating, L.P., Camden USA, Inc., Camden Development, Inc., and Camden Summit Partnership, L.P.—all of which are Delaware entities wholly owned or controlled by Camden Property Trust. Camden Development, Inc. serves as the on-site managing agent for Camden's apartment communities, including Camden Landmark and Camden Harbor View, and executes lease agreements on behalf of property-level owner entities.

27. Camden Property Trust holds approximately 93% of the outstanding common limited partnership units and the sole 1% general partnership interest in Camden Operating, L.P., and approximately 95% of the outstanding common limited partnership units and the sole 1% general partnership interest in Camden Summit Partnership, L.P., as reflected in its annual reports and proxy statements.

28. Camden Property Trust centrally directs the pricing of rental units across its entire portfolio through sophisticated revenue management software. Camden was a pioneer in the development and adoption of algorithmic rent-pricing

technology.

29. Camden Property Trust's 2025 Form 10-K further discloses that Camden Property Trust's "individual property marketing plans are structured to respond to local market conditions" and that Camden Property Trust focuses on "increasing rents as market conditions allow" and "maximizing rent collections" as "principal strategies to maximize property financial results." Through these centralized systems, Camden Property Trust—not individual community managers—determines and controls the rental prices advertised to consumers on camdenliving.com and the mandatory fees imposed as conditions of tenancy.

30. Defendant Camden Development, Inc. is a Delaware corporation and a wholly owned or controlled subsidiary of Camden Property Trust that serves as Camden's on-site managing agent, executes lease agreements, and administers the mandatory-fee transactions for Camden's apartment communities, including Camden Landmark and Camden Harbor View.

31. Camden Development, Inc. acts on behalf of, and pursuant to the centralized direction of, Camden Property Trust, which controls the advertising, pricing, fee structures, and leasing policies at issue. Both entities therefore participated in, directed, and/or are legally responsible for the conduct alleged herein and are proper defendants.

## JURISDICTION AND VENUE

32. The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Upon information and belief, the number of class members is over 100, many of whom have different citizenship from one or both Defendants. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

33. This Court has personal jurisdiction over Defendants because Defendants own, operate, and manage apartment communities within this District

and throughout the State of California, and regularly conduct substantial business in California. Defendants have sufficient minimum contacts with California and purposefully avail themselves of the California market by advertising apartment units, marketing rentals, accepting applications, and entering into lease agreements with California consumers through their online platform and in-state properties. A substantial part of the unlawful conduct giving rise to this action occurred within this District and Plaintiffs' claims arise out of and relate directly to Camden's conduct in California, including Camden's advertising and disclosure of rental pricing and mandatory fees to California consumers.

34. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this action occurred in this District. Plaintiffs viewed Camden's advertised rental prices, communicated with Camden, and entered into lease agreements for Camden apartment communities located in this District after relying on Camden's advertised pricing and representations.

## FACTUAL ALLEGATIONS

### 1. Factual Background

35. Consumers' reactions to sales and to false sales are well studied in academic literature. Research shows that reference prices, such as those used by Camden, materially impact consumers' behavior. A reference price affects a consumer's perception of the value of the transaction, the consumer's willingness to make the purchase, and the amount of money the consumer is willing to pay.[2]

36. These same principles apply with equal force in the housing market, where price is often the most important factor consumers consider when evaluating competing options. Unlike many discretionary purchases, housing is a necessity,

---

[2] Urbany, Joel E., William O. Bearden and Dan Weilbaker (1988), "The Effect of Plausible and Exaggerated Reference Prices on Consumer Perceptions and Price Search," Journal of Consumer Research, 15 (June), 95-110; Chandrashekaran, Rajesh (2004), "The Influence of Redundant Comparison Prices and Other Price Presentation Formats on Consumers' Evaluations and Purchase Intentions," Journal of Retailing, 80 (1), 53–66.

and consumers routinely compare rental properties based on the advertised monthly rent to determine which units fit within their budgets. As a result, landlords and property management companies possess a powerful incentive to advertise lower prices than their competitors, as even small differences in an advertised rental rate can materially influence a consumer's perception of affordability and decision to pursue a particular property.

37. Over the last several decades, the United States has experienced a significant shift toward renting rather than homeownership.[3] Rising home prices, elevated mortgage rates, limited housing inventory, increasing costs of living, and growing student debt burdens have made renting the only realistic housing option for millions of Americans, particularly younger generations who face increasing barriers to homeownership and prioritize flexibility and mobility. [4] As a result, the apartment rental industry has grown into a massive and increasingly concentrated sector of the economy.

38. The apartment rental industry generates hundreds of billions of dollars annually and continues to experience sustained growth, with the U.S. apartment rental market projected to reach approximately $305.7 billion in 2026.[5] California in particular has one of the largest renter populations in the nation, with more than one quarter of California renters residing in large apartment complexes operated by corporate landlords.

39. Median rents throughout California have risen dramatically over the last decade while rental vacancy rates have tightened across much of the State. From 2010 through 2023, California median rents increased by more than $800

---

[3] https://fred.stlouisfed.org/series/RHORUSQ156N (Last visited: September 1, 2026).

[4] https://www.realpage.com/news/realpage-unveils-new-multifamily-rental-trends/?utm (Last visited: September 1, 2026).

[5] https://www.ibisworld.com/united-states/industry/apartment-rental/1349/ (Last visited: September 1, 2026).

statewide.[6]

40. Because monthly rent is often a consumer's single largest recurring expense, apartment pricing plays a critical role in consumers' housing decisions. Prospective tenants routinely compare apartment communities based on the monthly rental prices prominently displayed online when deciding which apartments fit within their budgets and whether to pursue a particular unit.

41. The online apartment search process is heavily driven by price. Younger renters overwhelmingly conduct their housing searches online, with studies showing that approximately 74% to 78% of renters between the ages of 18 and 34 use rental search websites and applications to locate apartments, compare listings, and evaluate rental prices before deciding where to live.[7]

42. Consumers browse listings, filter by price, and eliminate options that appear to exceed their budgets, often before they ever discover mandatory fees that substantially increase the true monthly cost of renting the apartment. Because consumers rely so heavily on advertised online rental prices when comparison shopping for apartments, the omission of mandatory monthly fees from those advertised prices materially distorts the marketplace by making apartments appear more affordable than they truly are.

43. Separate from the base rent charged for the apartment itself, Camden's integrated advertising and leasing process requires consumers to purchase affirmative services for personal, family, and household use. Those services are not the leasehold itself, ordinary maintenance, common-area access, or other incidents of tenancy. They include the "Technology Package," "Front Door Trash Pickup," "Parking" and more, which Camden separately identifies and prices in its lease materials. Plaintiffs refer to these and materially similar separately priced service

---

[6] https://www.ppic.org/blog/as-people-leave-california-how-are-rental-prices-affected/ (Last visited: September 1, 2026).

[7] https://www.apartments.com/grow/learning-center/young-renters-survey (Last visited: September 1, 2026).

charges collectively as the "Mandatory Service Charges."

44. Because Camden requires consumers to purchase the Mandatory Service Charges as a condition of obtaining the advertised apartments, consumers cannot obtain those apartments at the advertised base-rent price.

45. A consumer may decline to use some features—for example, particular Technology Package functions or Front Door Trash Pickup on a particular occasion—but cannot decline to purchase and pay the corresponding Mandatory Service Charges while retaining the advertised apartment. Camden thus advertises a base-rent figure while withholding mandatory service prices from the initial offer.

46. California's Honest Pricing Law, codified at California Civil Code section 1770(a)(29), applies broadly to the "sale or lease of most goods and services that are for a consumer's personal use." The statute prohibits businesses from "[a]dvertising, displaying, or offering a price for a good or service that does not include all mandatory fees or charges," except certain government-imposed taxes and shipping costs.

47. The shift to online apartment searches has made drip pricing particularly harmful in the rental housing context. Unlike in-person apartment tours, where a prospective tenant may ask follow-up questions and negotiate pricing face-to-face, the online leasing process is structured and sequential. Consumers browse listings, filter by price, and eliminate options that appear to exceed their budgets, often before they ever discover the mandatory fees that increase the true monthly cost. This digital search environment makes consumers especially vulnerable to deceptive pricing because the initially advertised price serves as the primary filter through which all housing options are evaluated.

48. Recognizing the acute harm that drip pricing inflicts on consumers, California enacted its Honest Pricing Law, which took effect on July 1, 2024. As California Attorney General Bonta said, "California is soon to be the fourth biggest

economy in the world — and we have a responsibility to lead on important issues protecting consumers. The bottom line is that the price consumers see should be the price consumers pay."[8]

49. The law was passed in response to growing evidence that businesses across multiple industries have been systematically advertising artificially low prices by excluding mandatory fees from their initial price offerings. Senator Skinner echoed, "Californians have had enough with bait-and-switch pricing, when we're not told upfront the true cost of goods and services. Whether buying tickets to a concert or sporting event or booking a vacation or a hotel, Californians deserve to know exactly how much they're being asked to pay, and not be surprised later by hidden junk fees."[9]

50. The California Legislature determined that this practice undermines consumer welfare by preventing accurate price comparison, distorting competitive markets, and disproportionately burdening lower-income consumers who are most sensitive to price differences. By requiring businesses to include all mandatory fees in the initially advertised price, the Honest Pricing Law ensures that consumers can make informed financial decisions based on truthful, all-inclusive pricing.

51. The need for drip pricing legislation in the rental housing market is particularly urgent because housing is a necessity, not a discretionary purchase. When a consumer is misled about the price of a concert ticket or a hotel room, the financial harm, while real, is limited in scope. But when a consumer is misled about the price of an apartment—a financial commitment that typically spans twelve months or longer and represents the single largest line item in a household budget—the resulting harm compounds over the entire duration of the lease. California's drip pricing protections thus serve a critical function in the rental

---

[8] https://oag.ca.gov/news/press-releases/attorney-general-bonta-calls-california-legislature-ban-hidden-fees-aka-junk (Last visited: September 1, 2026).

[9] *Id.*

housing context by ensuring that the state's nearly six million renting households can accurately assess and compare the true cost of housing before committing to a lease.

**2. Camden's Unfair and Unlawful Business Practices**

52. Camden owns and operates many apartment communities across the United States, including multiple locations in the State of California. Camden offers its apartments for rent on its Website, where prospective renters can browse apartments across Camden's properties, view photos of the units, and compare prices.[10]

53. When browsing the Website, consumers are presented with a list of Camden's apartment communities and available rental units. For each community, Camden prominently advertises a "starting at" or "starting price" monthly rental rate. Those community-listing, search-results, and floor-plan pages do not display Camden's later "Monthly Rent Summary," even though consumers use those pages to filter and compare prices. A reasonable consumer understands the advertised representation to mean that at least one unit within that community is available to rent at the advertised price and that the advertised amount reflects the actual minimum monthly cost required to rent a unit there.

54. The advertised "starting" price is the primary pricing information presented to consumers during Camden's integrated advertising and leasing process and is intended to be used by prospective tenants when comparing the affordability of Camden's properties against competing rental communities. Camden does not display the "Monthly Rent Summary" while consumers are browsing community listings, search results, or floor plans. The summary appears only after a consumer has selected a specific unit and move-in date and proceeded into Camden's application flow, by which point the advertised price has already

[10] https://www.camdenliving.com/ (Last visited: September 1, 2026).

performed its function of drawing the consumer away from competing properties.

55. The below image depicts Camden's Website listing for its Camden Landmark apartment community in Ontario, California. Camden prominently advertises that apartments at the property are available "Starting at $2,129." A reasonable consumer viewing the below image would understand this representation to mean that at least one apartment unit within the community is available for $2,129 per month and that $2,129 represents the minimum monthly amount required to obtain the unit.




56. The image further demonstrates that the advertised starting price serves as the primary pricing information presented to consumers during the apartment search process. Consumers comparing apartment communities reasonably rely on this advertised price to evaluate affordability and determine whether a property fits within their budget before investing additional time in the leasing process.

57. After selecting a property, consumers are directed to specific floor plans and available units. As shown in the below image, Camden continues to advertise individualized "Starting Price" amounts for particular units. For example, Camden advertises the A1.2 floor plan with the previously advertised price of $2,129 and the A1.3 floor plan with a starting price of $2,169.




58. The differing advertised starting prices communicate to consumers that apartments within the same community may rent for different amounts depending on the particular characteristics of the unit. A reasonable consumer would therefore understand Camden’s "Starting Price" representation to mean that at least one unit is available at the advertised price and that the advertised amount reflects the minimum monthly cost required to rent that unit.

59. By displaying specific prices alongside specific units, Camden communicates to consumers that those units are available at the advertised rates. The differing prices among similar units further reinforce the impression that the listed prices reflect the actual rental cost of each unit, with variations attributable to

factors such as square footage, location within the property, availability, demand, or other desirable features.

60. Only after consumers proceed further into Camden's integrated advertising and leasing process—after selecting a specific unit and move-in date and entering Camden's application flow—does Camden disclose the existence of the Mandatory Service Charges. Camden does not display the "Monthly Rent Summary" on the community listing, search-results, or floor-plan pages where consumers filter and compare prices. The summary appears only at this later stage,




after the advertised price has drawn the consumer into the transaction. As shown in the below image, although Camden advertised the A1.2 unit as available for $2,129 per month, Camden later reveals that the consumer's actual monthly payment obligation is $2,289.27:

61. As a result, the apartment advertised at $2,129 per month is not actually available at the advertised price. Rather, the minimum amount required to obtain the unit and associated services is $2,289.27 per month. Camden's advertised price therefore does not reflect the true cost of the integrated transaction and creates the misleading impression that consumers can obtain the unit and associated services for substantially less than Camden ultimately requires them to

pay.

62. The statutory violation is complete when Camden advertises the price without the mandatory charges; no later itemization changes what Camden advertised or cures the omission.

63. Camden's "Monthly Rent Summary" separates the base "Rent" of $2,129.00 from "Association Fees" of $13.27, "Front Door Trash Pickup" of $33.00, and a "Technology Package" of $114.00, each with its own monthly price. The "Front Door Trash Pickup" and "Technology Package" amounts are Mandatory Service Charges; "Association Fees" are an additional mandatory fee or charge. The summary thus confirms that the initial advertised price omitted the separately priced service components and other mandatory fees or charges required for the transaction. It does not appear on the pages where consumers initially filter and compare rental prices and does not state the total amount required under Plaintiff Pitchford's executed agreement.

64. Camden's leases further confirm that the Mandatory Service Charges are independently identifiable and separately purchased consumer services "used for ordinary household purposes only," rather than mere incidents of the leasehold. Page 1 of the Camden Landmark Lease Agreement is captioned "Utilities and Other Services included in the Total Monthly Rent" and lists, as separate checkbox line items, "front door trash pickup," "homeowners/business association fees," and "Technology Package (which may include cable TV, internet and Wi-Fi)." The Lease states: "Resident agrees to pay for all items not checked above." Section 12 of the Lease is titled "Utilities and Services" and provides that "[a]ll utilities and services shall be used for ordinary household purposes only." Camden thus separately identifies and prices each service apart from base rent and treats the charges as items purchased in addition to the leasehold.

65. For example, the Technology Package provides separately identifiable internet, Wi-Fi, electronic-access, and smart-home services, while Front Door

Trash Pickup provides scheduled waste-collection services subject to its own collection procedures and requirements. Section 12(c) states that "Resident acknowledges that the Technology Package includes a number of amenities designed to enhance Resident's living experience in the Community," that the package "may, but is not required to, include digital adapters, cable TV, internet, WiFi, and electronic access devices," and that an "Internet Fee of $43.50 is accounted for in the total technology package monthly flat fee."

66. Camden ties the amount charged to its costs of providing the service and reserves the right to increase it if "Owner's costs of providing the Technology Package (including costs directly paid to communications providers or any indirect costs of the Owner associated with administering the Technology Package)" increase. The Lease defines certain smart-home offerings as "the Services," states that "the Services are provided directly from a third-party provider," that "the Owner is not a service provider," that the communications providers supplying the Technology Package amenities are independent contractors, and that the Services are governed by separate "Usage Terms" to which the Resident must consent. Camden separately disclaims all warranties "WITH RESPECT TO THE SERVICES AND EQUIPMENT," including implied warranties of merchantability and fitness for a particular purpose. These provisions identify affirmative services with their own provider, payment, usage, and warranty terms, not undifferentiated rent.

67. By advertising apartment units at prices that exclude the Mandatory Service Charges, Camden creates the false impression that consumers can rent units for the advertised amounts. Consumers reasonably believe that the listed starting prices represent the actual cost of obtaining the advertised units, when in reality Camden requires tenants to pay substantially more.

68. Camden's public marketing likewise describes these offerings as services it provides. On camdenliving.com, Camden markets the Camden

Landmark "expansive technology package" as including "Spectrum Internet and Digital Cable with 200+ channels" together with "two HD set-top boxes with one wireless router, all for a Camden resident-exclusive discounted rate." Camden's consumer blog states that Camden "works closely with service providers, such as Verizon FiOS, to bundle together high-speed internet service, cable television packages, equipment, and waived set up fees," and that "[t]he Technology Package averages approximately 53% off retail rates." Camden markets Front Door Trash Pickup as "door to door trash service" and has publicly described the Technology Package as giving it "a competitive advantage just as other amenities Camden offers."

69. Camden's Landmark property is not an isolated example of this practice. Camden Property Trust sets pricing and fee structures at the corporate level through centralized revenue-management systems. The challenged misrepresentations were made on Camden's single centralized website, camdenliving.com, using the same "Starting at" / "Starting Price" format at every California community. The practice was in effect throughout the Class Period. Through those systems, Camden knew which Mandatory Service Charges would be required at each advertised unit, the exact amount of each, and the resulting total. The following examples are representative of the uniform California practice and not isolated community-manager decisions.[11]

70. Examples of this uniform practice include Camden's Glendale, California property, which adds $192 in mandatory fees or charges per month; Camden's Long Beach, California property, which adds $212 per month; and Camden's San Diego, California properties, which add approximately $117.53 and

[11] Since the initiation of this action, Camden has ceased advertising its California properties on its own Website. Accordingly, the examples set forth herein reflect Camden's advertising and pricing practices as they existed at the time this action was filed.

$118.00, respectively, beyond advertised rent. Plaintiff Pitchford's charges totaled $160.27 per month, and Plaintiff Bell's totaled $208.00 per month. These concrete examples identify the recurring charges and amounts at issue and are representative of the broader California pricing practice; the precise scope of similar charges can be determined from Camden's records.

71. As a result, California consumers are presented with advertised prices that do not reflect the true minimum cost required to rent Camden's California apartments and the Mandatory Service Charges or other mandatory fees or charges associated with them. Rather than receiving the total price upfront, consumers are shown artificially low rental rates and only later learn that Camden has added substantial mandatory fees.

72. This pricing practice obscures the true cost of Camden's apartments, interferes with consumers' ability to compare competing housing options, and undermines the pricing transparency California law is intended to ensure.

**3. Camden's Actions Violate both State Law and Federal Policy.**

73. The prevalent practice among those in the housing industry of advertising a lower price at the start and then tacking on mandatory fees later, also known as "drip pricing," has gotten the attention of many state lawmakers. California has taken a leading role in prohibiting drip pricing, passing legislation that requires businesses to disclose the true total price of goods and services rather than advertising deceptively low prices that exclude mandatory fees. Other states, including Virginia, Colorado, Massachusetts, and Minnesota, have enacted similar protections, while additional legislation is under consideration in Illinois, Maryland, North Carolina, and New York.

74. Federal regulators have likewise addressed drip pricing. The FTC's Rule on Unfair or Deceptive Fees, 16 C.F.R. § 464.2, reflects federal policy against requiring consumers to piece together mandatory charges. By its terms, however,

the rule applies to live-event tickets and short-term lodging, not apartment rentals, and Plaintiffs do not assert it as a direct predicate for the UCL unlawful prong.

75. Before this, in 2024, the FTC brought an enforcement action against Invitation Homes Inc. for allegations of drip pricing.[12] The FTC alleged that Invitation Homes tacked on a slew of undisclosed fees, including a "Lease Easy bundle" fee, an "air filter delivery" fee, and a "smart home technology" fee, which increased tenants' rent by $60 per month. The FTC brought a complaint under the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45(a). Invitation Homes agreed to a proposed settlement order that would require it to pay $48 million to compensate consumers harmed by the deceptive pricing scheme.[13]

76. More recently, in 2025, the FTC brought a complaint against Greystar Real Estate Partners, LLC and its many subsidiaries for engaging in drip pricing.[14] The undisclosed fees charged across Greystar's many properties included a valet trash fee, package delivery fees, smart home technology fees, common area maintenance fees, administrative fees, and pest control fees, among others. The FTC estimated that Greystar collected over $100 million in hidden fees alone between August 2019 and August 2022. In December 2025, Greystar agreed to pay $24 million in fines and to correct its deceptive price advertising.[15]

77. The parallels between the FTC's case against Greystar and Camden's conduct are striking and dispositive. Like Greystar, Camden advertises rental prices on its website that exclude Mandatory Service Charges and fees for

---

[12] https://www.ftc.gov/system/files/ftc_gov/pdf/1-Complaint_0.pdf (Last visited: June 1, 2026).

[13] https://www.ftc.gov/news-events/news/press-releases/2024/09/ftc-takes-action-against-invitation-homes-deceiving-renters-charging-junk-fees-withholding-security (Last visited: September 1, 2026).

[14] https://www.ftc.gov/system/files/ftc_gov/pdf/greystar_complaint_-_filed.pdf (Last visited: September 1, 2026).

[15] https://www.ftc.gov/news-events/news/press-releases/2025/12/greystar-agrees-pay-24-million-stop-deceptive-advertising-practices-result-ftc-colorado-lawsuit (Last visited: September 1, 2026).

technology packages, trash pickup, and other unavoidable charges. Like Greystar, Camden's hidden fees include technology/smart home fees, trash collection fees, and common area or association fees. Like Greystar, Camden collected millions of dollars in hidden fees from tenants who were not informed of these charges at the time they made their leasing decisions. The FTC estimated that Greystar collected over $100 million in hidden fees in just four states (California, Colorado, Nevada, and Utah) between August 2019 and August 2022. Upon information and belief, Camden has similarly collected tens of millions of dollars in undisclosed mandatory fees from its approximately 60,000 apartment homes nationwide.

78. The stipulated order in *FTC v. Greystar* permanently enjoins Greystar from misrepresenting the "Total Monthly Leasing Price" of any rental unit and requires that the Total Monthly Leasing Price be displayed more prominently than any other pricing information in Greystar's advertisements. The order further requires clear and conspicuous disclosure of all mandatory fees before Greystar accepts any payment from a consumer. These remedial requirements reflect the minimum standards of pricing transparency that all property managers—including Camden—are legally obligated to meet.

79. On December 8, 2025, the FTC published a business blog post titled "Are you managing a rental property? Lessons from the FTC's lawsuit against Greystar," which put the entire rental housing industry on explicit notice that drip pricing in apartment rentals violates the law. The FTC warned property managers: "Know that advertising a rental price that excludes mandatory charges is a violation of the law. So advertise the total cost of renting your unit up front." The FTC further stated: "Consumers shouldn't have to wait until they sign a lease or get their first month's bill to learn what it will actually cost to live in a rental."

80. The FTC's December 8, 2025 blog post specifically instructed property managers to "[d]o a thorough compliance check" and "[r]eview your website and advertisements to confirm they honestly advertise a rental's price,

including any mandatory fees at the property." The FTC concluded by warning that it "is reviewing harmful practices in the rental housing market and will not hesitate to take action against landlords taking advantage of Americans' housing needs by hiding mandatory fees."

81. Despite the Greystar enforcement action, the settlement, and the FTC's December 2025 public warning specifically directed at property managers, Camden has continued to engage in the identical drip-pricing conduct that the FTC found unlawful. Camden's continued violation of law after being placed on actual notice through the Greystar enforcement action and FTC guidance demonstrates willful and knowing misconduct.

82. Camden's use of centralized pricing software to set rents across its portfolio has itself been the subject of federal antitrust enforcement. Camden Property Trust has been named as a defendant in multiple lawsuits alleging that it and other multifamily landlords used RealPage's revenue management software to coordinate and inflate rental prices in violation of the Sherman Act. On January 7, 2025, the U.S. Department of Justice and ten state attorneys general filed a civil lawsuit against RealPage and several property managers, including Camden, alleging that the use of nonpublic competitor rent data through algorithmic pricing software constituted unlawful collusion. Camden Property Trust's participation in this algorithmic pricing scheme—and the resulting antitrust liability—further demonstrates that Camden Property Trust centrally sets and controls rental pricing across all of its communities, including the prices advertised on camdenliving.com that are the subject of this action.

83. Rather than continue to bring enforcement actions on an individual basis, in March 2026, the FTC proposed a new rule to address deceptive fee practices not just for those who sell live-event tickets or short-term lodging, but for those who provide rental housing as well. The Advance Notice of Proposed

Rulemaking was announced March 12, 2026, and the comment period ended on April 13, 2026.

84. The deceptive actions of Camden are alleged to violate California law. The FTC's enforcement actions and proposed rulemaking provide context for the federal policy against drip pricing, but Plaintiffs do not rely on those materials, or on the Gramm-Leach-Bliley Act, as independent predicates for the UCL unlawful prong.

**4. Camden Misleadingly Advertised the Prices of its Rental Units to Increase Profits and Gain a Competitive Edge**

85. By advertising rental units at prices that excluded Mandatory Service Charges and recurring fees, Camden made false, misleading, and deceptive representations regarding the true minimum total cost of the integrated transaction. Camden knew that consumers place substantial weight on advertised rental prices when comparing housing options and that consumers are more likely to pursue apartments that appear more affordable than competing properties. Camden therefore advertised artificially low prices in order to attract prospective tenants and distinguish its properties from those of competing landlords.

86. Through this pricing strategy, Camden created the false impression that its apartments were available at lower prices than they actually were and, in many instances, lower prices than comparable units offered by competitors. Camden intended consumers, including Plaintiffs and Class Members, to rely on the advertised prices when deciding whether to view, tour, apply for, and ultimately lease its apartments. By withholding Mandatory Service Charges and fees until later in the leasing process, Camden induced consumers to engage with its properties based on incomplete and misleading pricing information.

87. Camden intended for Plaintiffs and Class Members to be deceived or misled by its incomplete price disclosures. As a direct and proximate result of Camden's deceptive pricing practices, Plaintiffs and Class Members were unable to accurately compare the cost of Camden's apartments with competing housing

options, paid more than the advertised prices for their rental units, and suffered economic injury.

### 5. Camden Intends to Continue to Mislead Consumers about its Rental Prices

88. Camden's deceptive pricing practices provide it with a substantial competitive and financial benefit. Consumers searching for rental housing routinely compare apartment communities based on advertised monthly rent and are more likely to pursue properties that appear less expensive than comparable alternatives. By advertising rental units at prices that exclude Mandatory Service Charges and recurring fees, Camden is able to present its integrated transactions as more affordable than they actually are, thereby attracting consumers who might otherwise select competing housing options.

89. Camden's pricing strategy increases the likelihood that consumers will click on its listings, schedule tours, submit applications, and ultimately enter into lease agreements. At the same time, by excluding Mandatory Service Charges and fees from its advertised prices, Camden is able to collect additional revenue from tenants without incorporating those charges into the price consumers use to comparison shop.

90. Camden engaged in the practices complained of herein to further its private interests in increasing occupancy rates, maximizing rental revenue, and obtaining an unfair competitive advantage over landlords and property management companies that honestly disclose the full cost of renting their units upfront. Camden's pricing practices allow it to advertise lower prices than competitors while ultimately charging consumers substantially more than the advertised amount.

91. The demand for affordable housing continues to increase as rental prices rise throughout California and the United States. As housing costs become an increasingly important consideration for consumers, advertised rental price becomes an even more significant factor in the apartment-selection process.

Camden knows that consumers rely on advertised prices when determining which properties fit within their budgets and when comparing competing housing options.

92. Because Camden benefits financially from advertising artificially low prices and because consumers continue to rely on advertised rental rates when searching for housing, Camden has a strong incentive to continue omitting mandatory fees from the prices it advertises. Absent injunctive relief, Camden is likely to continue advertising rental units in a manner that conceals the true minimum cost of the integrated transaction and misleads consumers regarding the actual prices they will be required to pay to obtain an apartment.

93. Camden's ongoing conduct threatens future harm to prospective California tenants, Plaintiffs, Class Members, and the general public by impairing consumers' ability to accurately compare housing options, distorting competition within the rental housing market, and depriving consumers of the pricing transparency required by California law.

## PLAINTIFFS' EXPERIENCES

### 1. Plaintiff Pitchford

94. On January 13, 2026, Plaintiff Pitchford executed a written Lease Agreement for Camden Landmark through Camden's online leasing process. The agreement identifies Camden Landmark as Owner and was executed "by and through Camden Development, Inc. ('Camden'), as Owner's managing agent." It recites that it is made "[f]or and in consideration of the mutual promises contained herein." Under that agreement, Camden agreed to furnish, and Plaintiff agreed to purchase and pay a stated monthly price for, each Mandatory Service Charge, each separately identified and separately priced on page 1 under "Utilities and Other Services."

95. Through Camden's Website, Plaintiff Pitchford initially encountered an advertised monthly price of $2,138 for the apartment. Her executed Lease sets a "Total Monthly Rent" of $2,328.27, consisting of Rent of $2,138.00, Association

Fees of $13.27, a Carport parking charge of $30.00, Front Door Trash Pickup of $33.00, and a Technology Package of $114.00. The total required under the agreement was therefore $190.27 above the price Camden advertised and more than the $2,289.27 “Monthly Rent Summary” figure Camden displayed. Even that belated “Monthly Rent Summary” did not state the total monthly amount Camden ultimately required Plaintiff Pitchford to pay under the agreement. The advertised price was material to her decision to pursue the apartment and proceed through Camden’s integrated advertising and leasing process.

96. Plaintiff Pitchford reasonably relied on the advertised $2,138 price as material information when comparing and evaluating housing options and deciding whether to lease the apartment. She believed that the advertised price represented the full monthly amount she would need to pay to obtain the advertised apartment. The affordable price was one of the many reasons she was interested in renting at Camden Landmark.

97. Pursuant to that agreement, Camden undertook to furnish the identified services on service-specific terms, and Plaintiff Pitchford paid the corresponding monthly charges each month. The agreement provides that if Camden discontinues a service, the corresponding monthly charge ceases while the tenancy continues, confirming that the charge is consideration for the service and not rent for the apartment. Camden’s advertised price nevertheless omitted the very Mandatory Service Charges that Camden’s own agreement required Plaintiff Pitchford to purchase and pay as a condition of obtaining the advertised apartment. Camden thus never intended to offer the apartment and required services together at the advertised price.

**2. Plaintiff Bell**

98. In September 2024, Plaintiff Bell entered into a materially identical written agreement for Camden’s “Camden Harbor View” community in Long Beach, CA. The agreement separately states base rent and separately prices a

$108.00 Technology Package and a $100.00 Parking Monthly Rent Charge. The parking charge is governed by a separate parking license that expressly creates no landlord-tenant relationship and conveys no possessory interest in real property.

99. Through Camden's Website, Plaintiff Bell discovered the Camden Harbor View property which was advertised for $2,263 per month. This advertised price was a material factor in Plaintiff Bell's decision to pursue leasing the apartment. Only later did Camden disclose the Mandatory Service Charges and other mandatory fees Plaintiff Bell was required to purchase in addition to rent, including a "Technology Package" fee and "Parking Monthly Rent Charge," totaling $208.00 per month. Under the written agreement, Camden undertook to furnish those identified services and Bell agreed to purchase and pay the stated charges as a condition of obtaining the advertised apartment.

100. Plaintiff Bell reasonably relied on the advertised $2,263 price, as material pricing information when comparing and evaluating housing options and deciding whether to lease the apartment. He believed the $2,263 price represented the full monthly amount he would need to pay in order to lease his apartment and required services.

101. Pursuant to Plaintiff Bell's agreement, Camden undertook to furnish the Technology Package and parking service on their stated terms, and Bell paid the corresponding monthly charges. The agreements provide that if Camden discontinues a service, the corresponding monthly charge ceases while the tenancy continues. Camden's advertised price nevertheless omitted the very Mandatory Service Charges that Camden's own agreement required Bell to purchase and pay as a condition of obtaining the advertised apartment. Camden knew the specific charges and resulting total when it published the advertised price, but did not offer the apartment and required services together at that price.

102. Camden's Mandatory Service Charges and other mandatory fees or charges imposed on Plaintiffs are materially identical in nature to the fees that the

FTC found unlawful in its enforcement action against Greystar. Just as Greystar charged concealed technology package fees ($75–$175/month), trash pickup fees ($25–$35/month), and other mandatory charges that were not reflected in advertised rental prices, Camden charged Plaintiff Pitchford a Technology Package fee ($114.00/month), a Front Door Trash Pickup fee ($33.00/month), and an Association Fee ($13.27/month)—totaling $160.27/month beyond the advertised rent. Camden charged Plaintiff Bell a Technology Package Fee ($108.00/month) and a Parking Monthly Rent Charge ($100.00/month)—totaling $208.00/month beyond the advertised rent. The FTC has already determined that this precise conduct constitutes unlawful deceptive advertising.

103. Plaintiffs and Class Members have suffered damages as a result of Camden's practices because the advertising of the prices of Camden's integrated apartment-and-service transactions was, and remains, untrue and misleading under California state law. Plaintiffs and Class Members paid more for those transactions than they were led to believe.

## CLASS ALLEGATIONS

104. Plaintiffs bring this action pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and on behalf of all other persons similarly situated.

105. Plaintiffs propose the following Class definition, subject to amendment as appropriate:

**The California Class (the "California Class" or "Class")**

All persons in California who, within the applicable limitations period, entered into a lease for a residential apartment unit owned, managed, or operated by Camden after viewing or being presented with a rental price on Camden's website that excluded mandatory fees or charges required as a condition of tenancy.

The following are excluded from the Class: (1) any Judge presiding over this action and members of his or her family; (2) Camden, Camden's subsidiaries, parents, successors, predecessors, and any entity in which Camden or their parents

have a controlling interest (as well as current or former employees, officers, and directors); (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Camden's counsel; and (6) the legal representative, successors, and assigns of any such excluded persons.

106. Plaintiffs reserve the right to modify or amend the definitions of the proposed Class before the Court determines whether certification is appropriate.

107. The proposed Class meets the criteria for certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

108. **Numerosity.** This action is appropriately suited for a class action. The members of the Class are so numerous that the joinder of all members is impracticable. Upon information and belief, the proposed Class contains well over 100 members, and likely thousands of California consumers who have been damaged by Camden's conduct as alleged herein, the identity of whom is within the knowledge of Camden and can be easily determined through Camden's records.

109. **Common Questions Predominate.** This action involves common questions of law and fact to the potential Class because each Class Member's claim derives from the deceptive, unlawful, and unfair representations and omissions that led consumers to believe that the apartments available for rent were cheaper than they actually were. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each Class Member to recover. The questions of law and fact common to the Class are:

a. Whether Camden made false or misleading statements of fact in its advertisements;

b. Whether Camden's policies and actions regarding its advertising were unfair, deceptive, or misleading;

c. Whether Camden's advertised prices omitted mandatory charges and understated the minimum total cost of renting the advertised apartments;

d. Whether failing to disclose mandatory fees upfront was likely to deceive reasonable consumers;

e. Whether Camden was unjustly enriched as a result of its actions with respect to its mandatory fee practices and advertisements;

f. Whether the alleged conduct of Camden violates California Civil Code §§ 1750 et seq., California Business & Professions Code §§ 17500 et seq., California Business & Professions Code §§ 17501 et seq. and/or California Business & Professions Code §§ 17200 et seq.;

g. Whether Plaintiffs and members of the Class have suffered injury and have lost money or property as a result of such false or misleading discounts and reference prices;

h. Whether Camden should be enjoined from further engaging in the misconduct alleged herein;

i. Whether Plaintiffs and the members of the Class are entitled to declaratory and injunctive relief and the nature of that relief.

110. **Typicality.** Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs, like all Class Members, were exposed to Camden's deceptive pricing practices on Camden's Website and entered into leases for residential apartment units after being presented with a rental price that excluded mandatory fees and charges. Plaintiffs and the Class Members were injured by the same course of conduct, namely Camden's practice of advertising apartment rental prices that did not include mandatory recurring fees required as a condition of tenancy. Plaintiffs' claims arise from the same unlawful, unfair, and deceptive practices and are based on the same legal theories as the claims of all members of the Class.

111. **Adequacy of Representation.** Plaintiffs will fairly and adequately protect the interests of all Class Members because it is in Plaintiffs' best interests to prosecute the claims alleged herein to obtain full compensation due to Plaintiffs for the unfair and illegal conduct of which Plaintiffs complain. Plaintiffs also have no interests that conflict with, or are antagonistic to, the interests of the Class.

Plaintiffs have retained highly competent and experienced class action attorneys to represent Plaintiffs and the interests of the Class. By prevailing on their own claims, Plaintiffs will establish Camden's liability to all Class Members. Plaintiffs and Plaintiffs' counsel have the necessary financial resources to litigate this class action adequately and vigorously. Plaintiffs and counsel are aware of their fiduciary responsibilities to the Class and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for the Class.

112. **Superiority.** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. Individual actions by Class Members seeking individual remedies will tend to establish inconsistent standards of conduct for Camden and result in the impairment of Class Members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual Class Member may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual Class Members to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.

113. Plaintiffs seek monetary damages, non-duplicative restitution, disgorgement and declaratory relief, and injunctive relief on behalf of the Class. Unless a class is certified, Camden will be permitted to retain the benefits of its deceptive pricing practices while Plaintiffs and Class Members remain uncompensated for their injuries.

114. Following the initiation of this action, Camden ceased advertising its California properties on its Website. Camden's voluntary cessation of the challenged conduct, however, does not prevent Camden from resuming the same or

substantially similar advertising practices in the future. Camden continues to own and operate its California properties and remains capable of again advertising those properties on its Website without including mandatory fees in the advertised rental price. Accordingly, injunctive and declaratory relief remain necessary to prevent Camden from resuming the deceptive pricing practices challenged in this action.

115. Camden has acted and refused to act on grounds generally applicable to the Class, making final injunctive and declaratory relief appropriate with respect to the Class as a whole.

## FIRST CAUSE OF ACTION
**Violations of the Consumer Legal Remedies Act ("CLRA"),**
**Cal. Civ. Code § 1770(a)(29)(A)**
**(On Behalf of Plaintiffs and the California Class)**

116. Plaintiffs reallege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

117. Plaintiffs bring this claim individually and on behalf of the members of the California Class against Camden.

118. Plaintiffs and all members of the California Class are "persons" and "consumers" as defined in Cal. Civ. Code § 1761(d).

119. Defendants are "persons" as defined in Cal. Civ. Code § 1761(c).

120. The CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770.

121. The CLRA defines "services" as work, labor, and services for other than a commercial or business use, including services furnished in connection with the sale or repair of goods. Cal. Civ. Code § 1761(b).

122. The CLRA must be "liberally construed and applied to promote its underlying purposes," including protecting consumers against unfair and deceptive business practices. Cal. Civ. Code § 1760.

123. Plaintiffs' transactions with Camden included the purchase of separately identified and separately priced services for personal and household use. Plaintiff Pitchford's written Camden Landmark Lease, executed January 13, 2026, separately lists base rent and Mandatory Service Charges, including $33.00 for "Front Door Trash Pickup" and $114.00 for the "Technology Package," expressly identifying them as "Utilities and Other Services." The agreement was made "[f]or and in consideration of the mutual promises contained herein," and required Camden to furnish, and Pitchford to purchase and pay for, those identified services. Plaintiff Bell entered into a materially identical written agreement that separately lists base rent and prices a $108.00 "Technology Package" and $100.00 parking service. These separately priced services, and materially similar required services, constitute the "Mandatory Service Charges" alleged herein.

124. These services are separate from the leasehold consideration itself. Camden does not incorporate their cost into base rent; instead, it separately itemizes and charges for each service in addition to rent. Plaintiffs therefore independently purchased and paid consideration for consumer services within the meaning of Cal. Civ. Code § 1761(b).

125. The relevant CLRA transaction is Camden's integrated advertising and leasing process. At formation, Camden advertised a base-rent price for an apartment and then entered into a written agreement in which Camden agreed to furnish, and the consumer agreed to purchase and pay for, the separately identified and separately priced Mandatory Service Charges. Camden required the consumer, as part of that same process and transaction, to purchase and pay for those services as a condition of obtaining the advertised apartment. The transaction was intended to result in the purchase of those services for personal, family, and household use.

126. Camden's initial advertised price did not include the separately priced Mandatory Service Charges. Only later, after consumers proceeded through the

advertising and leasing process, did Camden disclose those charges and the total payment required to obtain the advertised apartment and services.

127. Camden's subsequent pricing disclosures expressly distinguished the services from base rent by separately itemizing each service and its corresponding monthly price. During performance, Plaintiffs paid those recurring service charges each month. The agreements further provide that if Camden discontinues a service, the corresponding monthly charge ceases while the tenancy continues. Camden's own pricing structure and performance therefore confirm that the services were separately priced components whose mandatory prices were omitted from Camden's advertised prices.

128. Functional separateness is further demonstrated by Camden's use of third-party providers and independent contractors to provide and repair the Technology Package, its separate equipment, installation and maintenance requirements, and its own "Usage Terms" and consent requirements. These features further demonstrate that the Technology Package is a distinct service rather than merely an incident of tenancy. Front Door Trash Pickup is likewise an affirmative service with defined collection times, containers, and disposal requirements distinct from ordinary property maintenance.

129. Plaintiffs therefore do not rely on ordinary maintenance, common-area amenities or access, package receipt, community events, or other incidents of the landlord-tenant relationship as CLRA services. Plaintiffs' claims do not rely on the residential lease itself constituting a "service." Camden separately identified, priced, and charged for the Mandatory Service Charges that Plaintiffs were required to purchase in addition to paying base rent.

130. Camden's own lease documents confirm that the Mandatory Service Charges constitute consideration for separately identifiable consumer services rather than undifferentiated consideration for possession of real property. Both Plaintiffs' leases separately state the base rent and monthly price of each

challenged service, designate the offerings as "Utilities and Other Services," and impose service-specific performance, equipment, usage, consent, repair, and warranty terms. Section 12(d) governs "front door trash pickup service," imposing service-specific terms including designated collection nights, Camden-supplied containers, and a requirement that bagged waste be placed outside the Unit's front door "only between the hours of 6:00pm - 8:00pm." Camden may discontinue the service on 30 days' notice, "in which case, Resident would no longer be responsible for the monthly charge associated with front door trash pickup." The Lease further states that the front door trash pickup amount "will be used whether or not Resident uses the front door trash pickup" and that the charge "is due in advance on or before the first day of the month, with Monthly Rent and in the same manner as Monthly Rent but will not be considered Monthly Rent." Camden therefore expressly distinguishes the service charge from rent for the apartment. The agreements further provide that if Camden discontinues a service, the corresponding monthly charge ceases while the tenancy continues. The Technology Package is provided through third-party communications and technology providers, and Camden ties the amount charged to provider and administrative costs. Plaintiff Bell's parking charge is governed by a separate license that expressly states that it creates no landlord-tenant relationship and conveys no possessory interest in real property. Camden's 2025 Form 10-K likewise states that Camden "earn[s] revenues under contractual terms for other services considered non-lease components within a lease contract" and that "[t]hese amounts received under contractual terms for other services are charged to our residents and recognized monthly as earned."

131. Therefore, Camden violated section 1770(a)(29)(A) by advertising prices for the integrated apartment-and-services transaction without including the Mandatory Service Charges. The advertised "Starting at" and unit-specific "Starting Price" amounts did not include separately priced "Technology Package"

and "Front Door Trash Pickup" charges or, where applicable, the separately priced parking service identified as "Parking Monthly Rent Charge," or other mandatory fees or charges required to obtain the advertised apartment and associated services. Because consumers could not obtain the advertised apartment without purchasing and paying those charges, Camden's initial advertised prices did not include all mandatory fees or charges.

132. In addition to the separately identified and separately priced service transactions alleged above, Plaintiffs plead a second services route. Camden's consumer-facing online apartment reservation/leasing process and ongoing administration of the resulting tenancy constitute work, labor, and services for personal, family, and household use within Cal. Civ. Code § 1761(b). Camden markets available apartments, displays and communicates price and availability information, solicits and processes applications, facilitates online reservation and lease formation, and administers the resulting apartment-and-services arrangement. These are affirmative consumer-facing services, not the leasehold or real property itself, and the integrated transaction was intended to result in consumers' purchase of the Mandatory Service Charges.

133. Section 1770(a)(29) was added by Senate Bill 478 (2023), sponsored by the California Attorney General, and became operative on July 1, 2024. The Assembly Committee on Judiciary's June 27, 2023 analysis states that SB 478 "clarifies that the practice of hiding required fees is deceptive and unfair to consumers wherever it occurs—not just in certain industries," and that its operative language is "intentionally broad to capture any fee or charge that a consumer cannot reasonably avoid." The analysis further explains that the bill "focuses on price advertising as opposed to price disclosure" because "price transparency must happen at the initial point of advertising, not just before the point-of-sale." The Legislature expressly carved out specified industries, including compliant broadband providers and licensed vehicle dealers, and later, through SB 1524,

certain restaurants and food vendors, but enacted no exemption for residential rental housing.

134. Rental-housing organizations, including the Apartment Association of Orange County, the East Bay Rental Housing Association, the Affordable Housing Management Association–Pacific Southwest, and the California Association of Realtors, registered opposition to SB 478, reflecting the industry's understanding that the bill reached residential rental advertising; the Legislature enacted it notwithstanding that opposition. The Attorney General's published guidance states that the law "applies to the sale or lease of most goods and services that are for a consumer's personal use," answers "No" to whether a business can comply by disclosing additional required fees before a consumer finalizes a transaction, states that mandatory charges used to defray a business's own costs must be included in the advertised price, and explains that a business remains "free to provide a subsequent breakdown" of those charges. Camden's later "Monthly Rent Summary" is, at most, such a subsequent breakdown.

135. Camden violated section 1770(a)(29)(A) by advertising prices for the integrated apartment-and-services transaction without including the Mandatory Service Charges. The advertised "Starting at" and unit-specific "Starting Price" amounts did not include separately priced "Technology Package" and "Front Door Trash Pickup" charges or, where applicable, the separately priced parking service identified as "Parking Monthly Rent Charge," or other mandatory fees or charges required to obtain the advertised apartment and associated services. Because consumers could not obtain the advertised apartment without purchasing and paying those charges, Camden's initial advertised prices did not include all mandatory fees or charges. Camden's conduct as described herein was and is in violation of the CLRA which specifically prohibits "[a]dvertising, displaying, or offering a price for a good or service that does not include all mandatory fees or

charges" other than those expressly excluded by statute. Cal. Civ. Code § 1770(a)(29)(A).

136. Camden has violated Section 1770(a)(9) by advertising apartment units at prices that Camden never intended to offer as advertised. At the time Camden published each advertised price, it already knew, through its centralized pricing and revenue-management systems, which Mandatory Service Charges would be required for that unit, the exact amount of each charge, and the resulting total monthly payment. Camden never intended to lease the advertised apartment together with the required services at the advertised price; it intended to impose the mandatory charges shown later in the leasing flow.

137. Camden's misrepresentations were likely to deceive, and did deceive, Plaintiffs and reasonable consumers. Camden knew the charges required for each advertised unit, knew the exact amounts, and knew the resulting total when it published the advertised price. Camden's later disclosure of those charges does not change its intent at the time of advertising or make the advertised apartment and required services available at the advertised price.

138. Camden's deceptive pricing practices significantly impacted Plaintiffs and the members of the California Class. The rental prices displayed on the Website were material to consumers because price is one of the most important factors considered when searching for and comparing housing options. Reasonable consumers rely on advertised rental prices to determine affordability, compare competing apartment communities, and decide whether to pursue a particular property. By advertising rental prices that excluded mandatory recurring fees, Camden misled consumers regarding the true cost of renting its apartments. As a result, Plaintiffs and members of the California Class paid more than the advertised prices for their apartments and were deprived of the ability to accurately compare Camden's properties with competing housing options.

139. Class-wide reliance may be inferred because Camden's omissions and misrepresentations regarding the true cost of its integrated apartment-and-services transactions were material. The specific who, what, when, where, and how are uniform: Camden Property Trust set the pricing and fee structures through centralized revenue-management systems; Camden published the challenged "Starting at" and "Starting Price" representations on camdenliving.com; it used the same format at every California community throughout the Class Period; and it omitted mandatory charges required for the advertised units. A reasonable consumer would consider the total monthly cost of renting an apartment important when deciding whether to lease a unit and how much to pay for housing.

140. Camden's omissions and misrepresentations were a substantial factor and proximate cause of Plaintiffs' and the California Class members' injuries. Plaintiffs and members of the California Class reasonably relied on Camden's advertisements when evaluating housing options and deciding whether to enter into lease agreements with Camden.

141. Plaintiffs and the members of the California Class were injured as a direct and proximate result of Camden's conduct because they paid the Mandatory Service Charges that were not included in Camden's advertised prices and therefore paid more than the amounts Camden represented consumers would pay for its apartments. Had Camden accurately disclosed the total mandatory cost of renting its apartments upfront, including the Mandatory Service Charges, Plaintiffs and members of the California Class would have been able to make informed comparisons among competing housing options and may have chosen different housing arrangements.

142. Accordingly, pursuant to Cal. Civ. Code § 1780(a), Plaintiffs, on behalf of themselves and all other members of the California Class, seek actual damages, restitution, injunctive relief, and all other remedies available under the CLRA.

143. The practices alleged herein have caused substantial harm to Plaintiffs, the California Class, and the general public. Plaintiffs' and the California Class members' injuries were proximately caused by Camden's unlawful, unfair, and deceptive business practices. Although Camden ceased advertising its California properties on its Website following the filing of this action, Camden remains capable of resuming the challenged practices. Without injunctive relief, prospective tenants and the California public remain at risk of being misled regarding the true minimum cost of Camden's integrated apartment-and-services transactions.

144. Plaintiffs therefore seek a permanent injunction requiring Camden, if and when it advertises its California properties, to include all Mandatory Service Charges and other mandatory fees in the prices advertised on its Website and in its marketing materials. Plaintiffs further seek attorneys' fees, costs, and all other relief available under the CLRA, including a public injunction designed to protect consumers from Camden's ongoing deceptive pricing practices.

145. Pursuant to Cal. Civ. Code § 1782(a), on April 28, 2026, Plaintiffs Pitchford and Bell, on behalf of both Plaintiffs, provided Camden with notice of its violations of the CLRA *via* first class mail and an opportunity to cure those violations. Camden did not respond to the notice and failed to provide appropriate relief within the time permitted by the statute. The venue affidavits required by Cal. Civ. Code § 1780(d) for each Plaintiff are filed concurrently.

**SECOND CAUSE OF ACTION**
**Violation of California's False Advertising Law ("FAL"),**
**Cal. Bus. & Prof. Code §§ 17500 *et seq.***
**(On Behalf of Plaintiffs and the California Class)**

146. Plaintiffs reallege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

147. Plaintiffs bring this claim individually, and on behalf of the members of the California Class against Camden.

148. Camden has violated Section 17500 of the California Business and Professions Code.

149. Camden has engaged in false or misleading advertising in violation of the FAL by advertising rental unit prices and associated mandatory charges in a manner that understated the minimum total price consumers were required to pay. These advertisements had the capacity, likelihood, and tendency to deceive or confuse the public.

150. Camden's representations were likely to deceive, and did deceive, Plaintiffs and reasonable consumers. Camden knew, or should have known, that its advertised rental prices were inaccurate and misleading because they omitted mandatory fees that Camden knew would be charged to every tenant.

151. California's False Advertising Law prohibits not only advertising that is literally false, but also advertising that, although technically true, is likely to mislead or deceive reasonable consumers. *Brady v. Bayer Corp.*, 26 Cal. App. 5th 1156, 1173 (2018) ("these laws prohibit 'not only advertising which is false, but also advertising which[,] although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public.'"). To state a claim under the FAL, it is sufficient to allege that members of the public are likely to be deceived by the challenged advertising. *Id.* Camden's omission of mandatory charges from the advertised price is misleading for the reasons alleged above.

152. Camden advertised apartment rental prices that did not reflect the true minimum cost required to rent its apartments. The prices displayed on Camden's Website excluded mandatory recurring fees and charges that tenants were required to pay as a condition of tenancy, causing the advertised prices to be materially lower than the actual prices consumers were required to pay.

153. Camden's advertised rental prices did not clearly, accurately, or conspicuously disclose that mandatory fees would be added to the advertised price. Nor did Camden disclose the total price consumers would be required to pay until

later in the leasing process. As a result, reasonable consumers were likely to believe that the advertised rental prices represented the actual monthly cost of renting the advertised units.

154. Camden's deceptive pricing practices led Plaintiffs and the members of the California Class to make rental decisions based on incomplete and misleading pricing information. Camden's omissions and misrepresentations were intended to induce consumers to pursue, apply for, and lease Camden's apartments by creating the false impression that the apartments were available at lower prices than Camden actually charged. Plaintiffs reasonably relied on Camden's advertised rental prices when deciding to rent apartments from Camden.

155. Class-wide reliance may be inferred because Camden's omissions and misrepresentations regarding the true cost of its apartments were material. Camden Property Trust controlled the pricing and fee structures centrally; Camden made the representations on camdenliving.com in the same “Starting at” and “Starting Price” formats at California communities; the representations omitted mandatory charges required for the advertised units; and the later “Monthly Rent Summary” appeared only after a consumer selected a unit and entered the application flow. A reasonable consumer would consider the total monthly cost of renting an apartment important when deciding whether to lease a unit and when comparing competing housing options.

156. Camden's omissions and misrepresentations were a substantial factor and proximate cause of the damages suffered by Plaintiffs and the members of the California Class.

157. Plaintiffs and the members of the California Class were injured as a direct and proximate result of Camden's conduct because they paid mandatory fees that were excluded from Camden's advertised prices and therefore paid more than the amounts represented in Camden's advertising. Had Camden accurately disclosed the total mandatory cost of renting its apartments at the outset, Plaintiffs

and members of the California Class would have been able to make informed purchasing decisions and may have selected alternative housing options.

158. Plaintiffs plead the FAL, UCL, and quasi-contract claims in the alternative to the CLRA damages claim. Plaintiffs and the California Class Members do not have an adequate remedy at law for the prospective risk addressed by the requested injunction. Damages for charges already paid would not redress the risk that Camden will resume the challenged advertising, and Camden's voluntary cessation does not prevent it from doing so. Although Camden ceased advertising its California properties on its Website following the filing of this action, Camden continues to own and operate those properties and remains capable of resuming the same or substantially similar advertising practices at any time. Accordingly, injunctive relief is necessary to prevent Camden from resuming the challenged conduct and to ensure that any future advertising of its California properties accurately discloses the total mandatory price consumers are required to pay.

159. Plaintiffs and the California Class Members seek restitution under the FAL as an alternative and nonduplicative remedy to the CLRA damages claim. Restitution may reach amounts Camden received through the misleading advertising and may rest on a measure of recovery that is not coextensive with CLRA damages. Plaintiffs do not seek duplicative recovery or the value of services actually received. If monetary damages are unavailable or do not provide the same measure of recovery, restitution remains necessary to restore amounts obtained through the challenged pricing practice.

## THIRD CAUSE OF ACTION
**Violation of California's Unfair Competition Law ("UCL"),**
**Cal. Bus. & Prof. Code §§ 17200 *et seq.***
**(On Behalf of Plaintiffs and the California Class)**

160. Plaintiffs reallege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

161. Plaintiffs bring this claim individually, and on behalf of the members of the California Class against Camden.

162. Camden's acts and omissions alleged herein, including its alleged violations of the False Advertising Law, California's Honest Pricing Law, and California Civil Code sections 1770(a)(29)(A) and 1770(a)(9), constitute unlawful, unfair, and fraudulent business practices in violation of the UCL. Plaintiffs plead each prong as an independent theory: the unlawful prong is based on Camden’s alleged violations of the FAL, the Honest Pricing Law, and those Civil Code provisions; the fraudulent prong is based on the likelihood of deception; and the unfair prong is based on the consumer and competitive harms alleged below.

163. Camden's conduct violates the "**unlawful**" prong of the UCL because Camden disseminated advertising that violated the FAL by excluding mandatory fees and charges required as a condition of obtaining the advertised apartment and associated services. Camden's conduct further violates California Civil Code section 1770(a)(29)(A), California Civil Code section 1770(a)(9), and California's Honest Pricing Law. The FTC’s Rule on Unfair or Deceptive Fees, 16 C.F.R. § 464.2, is alleged only as evidence of federal policy against drip pricing; by its terms, it applies to live-event tickets and short-term lodging, not apartment rentals, and is not asserted as a direct predicate here. Plaintiffs do not assert the Gramm-Leach-Bliley Act as a predicate because no GLBA conduct is alleged.

164. Camden's conduct also violates the "**fraudulent**" prong of the UCL because Camden advertised apartment rental prices that did not reflect the true minimum cost required to rent its apartments. By displaying rental prices that excluded mandatory recurring fees, Camden created the false impression that consumers could rent apartments for the advertised amounts when, in reality, consumers were required to pay substantially more. These representations and omissions were likely to deceive reasonable consumers.

165. Camden's material omissions and misrepresentations are likely to mislead reasonable consumers because rental price is one of the most important factors consumers consider when searching for housing. Reasonable consumers viewing Camden's advertised rental prices would believe that the prices represented the actual monthly cost of renting the advertised apartments or, at a minimum, the minimum monthly cost required to obtain the advertised units.

166. Plaintiffs and the members of the California Class relied upon Camden's omissions and misrepresentations concerning the true cost of renting Camden's apartments. As to Plaintiff Pitchford, before executing her January 13, 2026 Lease, while viewing Camden’s website listing for Camden Landmark in Ontario, California, she saw an advertised monthly rent of $2,138 before later seeing mandatory charges totaling $160.27, including an Association Fee, Front Door Trash Pickup fee, and Technology Package fee. As to Plaintiff Bell, in or about September 2024, while viewing Camden’s website listing for Camden Harbor View in Long Beach, California, he saw an advertised monthly rent of $2,263 before later seeing mandatory charges totaling $208.00, including a Technology Package fee and Parking Monthly Rent Charge.

167. Camden's omissions and misrepresentations were material because a reasonable consumer would consider the total monthly cost of renting an apartment important when deciding whether to lease a unit and when comparing competing housing options. Class-wide reliance may therefore be inferred.

168. The Greystar enforcement action further demonstrates that Camden’s drip-pricing scheme constitutes a ‘uniform course of conduct likely to mislead’ the entire Class. The FTC found that Greystar’s identical practice of advertising rental prices while hiding mandatory fees was inherently deceptive to all consumers exposed to it. Camden’s challenged conduct constitutes a uniform course of conduct likely to mislead the entire Class. The who, what, when, where, and how are alleged: Camden Property Trust set the pricing and fee structures through

centralized revenue-management systems; Camden published the challenged representations on its single centralized website, camdenliving.com; it used the same "Starting at" and "Starting Price" formats at every California community throughout the Class Period; and it omitted mandatory charges that Camden knew each advertised unit required. The pleaded examples include Glendale fees of $192, Long Beach fees of $212, San Diego fees of approximately $117.53 and $118.00, Pitchford's $160.27, and Bell's $208.00.

169. Camden's conduct, as alleged herein, was immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

170. Camden violated the "**unfair**" prong of the UCL by advertising apartment rental prices that excluded mandatory recurring fees and charges. The practice violates the legislatively declared price-transparency policy embodied in California Civil Code section 1770(a)(29) and the Honest Pricing Law, as well as the anti-deception policy embodied in the FAL. Camden's practice also causes actual and threatened competitive harm: Camden's listings appear cheaper than listings from landlords that advertise all-in prices, divert prospective tenants from competing communities, and pressure competitors to adopt the same practice.

171. Camden's conduct further violates the established public policies embodied in California Civil Code section 1770(a)(29), the Honest Pricing Law's price-transparency requirements, and the FAL's prohibition on deceptive advertising. Those policies are directly implicated because Camden withheld mandatory charges from the price used to attract and compare prospective tenants, while landlords that disclose all-in prices compete against Camden's artificially lower listings.

172. As a direct and proximate result of Camden's unlawful, unfair, and fraudulent conduct, Camden received monies from Plaintiffs and members of the California Class to which it was not entitled, including mandatory fees that were excluded from Camden's advertised prices. Such monies are subject to restitution.

173. Plaintiffs and the members of the California Class suffered economic injury because they paid mandatory recurring charges in addition to Camden's advertised prices after relying on those prices to pursue and evaluate the respective apartments. Plaintiff Pitchford identifies $160.27 in monthly charges and Plaintiff Bell identifies $208.00 in monthly charges. Plaintiffs seek only the opportunity to accurately compare price differential or other recoverable loss caused by the alleged omission, not the value of services received and not recovery duplicative of CLRA, FAL, or quasi-contract relief.

174. The harm to Plaintiffs and the members of the California Class greatly outweighs any utility associated with Camden's conduct. There is no legitimate public benefit to concealing mandatory fees from advertised rental prices. Camden's conduct distorts competition, impairs informed consumer decision-making, and undermines the transparency required by California law.

175. Plaintiffs and the members of the California Class could not reasonably avoid the injury caused by Camden because the existence and amount of Camden's mandatory fees were omitted from the advertised prices and disclosed only later in the leasing process, after consumers had already relied upon Camden's advertised prices.

176. Following the filing of this action, Camden ceased advertising its California properties on its Website. Camden, however, continues to own and operate residential properties throughout California and remains capable of resuming the same or substantially similar advertising practices at any time. Nothing prevents Camden from again advertising its California apartments at prices that exclude mandatory recurring fees and charges.

177. Camden's cessation of the challenged advertising does not eliminate the need for prospective relief. Camden has not demonstrated that the challenged practices will not recur and remains free to resume advertising its California properties using the same pricing practices challenged in this action. Without

injunctive relief, Plaintiffs, members of the California Class, prospective California tenants, and the California public remain subject to the risk that Camden will resume advertising apartment prices that fail to disclose the total mandatory price required to obtain the advertised apartments.

178. Plaintiffs, on behalf of themselves and all members of the California Class, seek public injunctive relief under the UCL requiring Camden, if and when it advertises its California properties, to advertise apartment rental prices that include all mandatory fees and charges and otherwise comply with California law.

179. Camden's actions have caused substantial harm to Plaintiffs, the California Class, and the public. These practices are ongoing and likely to continue unless enjoined by this Court.

180. Plaintiffs and the California Class Members seek restitution under the UCL as an alternative and nonduplicative remedy to the CLRA damages claim. Restitution may reach amounts Camden received through the challenged advertising and may rest on a measure of recovery that is not coextensive with CLRA damages. Plaintiffs do not seek duplicative recovery or the value of services actually received. If monetary damages are unavailable or do not provide the same measure of recovery, restitution remains necessary to restore the benefit Camden obtained through its unlawful, unfair, and fraudulent practice.

## FOURTH CAUSE OF ACTION
### Restitution Based on Quasi-Contract (Pled in the Alternative)
### (On Behalf of Plaintiffs and members of the California Class)

181. Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

182. Plaintiffs plead this quasi-contract restitution claim only in the alternative, and only in the event the Lease Agreements are found unenforceable, void, or inapplicable as to the Mandatory Service Charges, or are found to have been induced by the misleading advertising alleged herein. Plaintiffs do not seek to displace any enforceable contract remedy or obtain duplicative recovery.

183. Plaintiffs bring this claim individually and on behalf of the members of the Class against Camden.

184. Plaintiffs and the members of the Class conferred a direct benefit upon Camden by paying rent and mandatory recurring fees in connection with residential apartment leases obtained through Camden's deceptive pricing practices. The benefit relevant to this alternative theory is limited to any amount Camden obtained through the alleged misleading pricing practice beyond what Plaintiffs would have paid had the total mandatory price been disclosed at the outset.

185. Plaintiffs and the members of the Class reasonably believed that the rental prices advertised on Camden's website represented, or at minimum closely approximated, the actual monthly cost required to rent Camden's apartments. Instead, Camden advertised apartment units at prices that excluded mandatory recurring fees and charges that tenants were required to pay as a condition of tenancy.

186. By advertising artificially low rental prices while omitting mandatory fees, Camden created a misleading impression regarding the true cost of its apartments. This practice made Camden's properties appear more affordable than they actually were and more competitively priced than comparable housing options. As a result, consumers were induced to pursue, apply for, and lease Camden's apartments based on incomplete and misleading pricing information.

187. Camden knowingly accepted and retained payments from Plaintiffs and the members of the Class, including mandatory fees and charges that were excluded from the prices Camden advertised to consumers. Camden retained amounts it would not have received, or would have received on different terms, absent the alleged omission. This alternative theory applies only if the Lease Agreements are found unenforceable, void, or inapplicable as to the Mandatory Service Charges, or are found to have been induced by the misleading advertising

alleged herein. This theory does not allege that Camden failed to provide the apartments or services, and Plaintiffs do not seek the value of services actually received.

188. By its wrongful acts and omissions described herein, including its practice of advertising apartment rental prices that excluded mandatory recurring fees and charges, Camden was unjustly enriched at the expense of Plaintiffs and the members of the Class.

189. Plaintiffs' and the Class members' losses, and Camden's enrichment, were directly related to and flowed from Camden's deceptive pricing practices. Camden obtained revenues, fees, and other financial benefits that it would not have obtained, or would not have obtained on the same terms, had it accurately disclosed the total cost of renting its apartments.

190. Camden has profited from its unlawful, unfair, and deceptive conduct at the expense of Plaintiffs and the members of the Class. Under the circumstances alleged herein, it would be inequitable and unjust for Camden to retain the benefits, profits, fees, and other compensation obtained through its deceptive pricing practices.

191. Plaintiffs and the members of the Class have suffered the economic injury described above as a direct and proximate result of Camden's retention of any such restitutionary amount.

192. Accordingly, Plaintiffs and the members of the Class seek, in the alternative, restitution, disgorgement, and/or the imposition of a constructive trust upon all monies, profits, benefits, fees, and other compensation wrongfully obtained and retained by Camden as a result of the conduct alleged herein.

**FIFTH CAUSE OF ACTION**

**Declaratory Relief**

**(On Behalf of Plaintiffs and members of the California Class)**

193. Plaintiffs repeat and reallege each and every allegation contained in the preceding paragraphs as if fully set forth herein.

194. Plaintiffs bring this claim individually and on behalf of the members of the Class against Camden.

195. Camden’s implementation of mandatory fees that exceed the advertised price of its apartments is alleged to violate California’s consumer-protection laws, including the CLRA as to the separately purchased services, the FAL, and California's Honest Pricing Law, which requires accurate upfront pricing for covered goods and services. The declaratory-relief claim rests on that alleged California conduct and the parties’ ongoing dispute over charges imposed under existing leases.

196. Plaintiffs and Class Members seek a declaration that Camden’s implementation and imposition of mandatory fees above the advertised price of its apartments is unlawful and may not be enforced. Plaintiff Pitchford’s Lease runs through June 13, 2027 and thereafter automatically renews on a month-to-month basis, and she continues to be charged the Mandatory Service Charges each month. Camden maintains that those charges are lawful and properly imposed. The parties therefore have a live, forward-looking dispute over their respective rights and obligations under existing leases, independent of any claim for damages for past payments.

197. Accordingly, pursuant to 28 U.S.C. § 2201, Plaintiffs and the Class seek a judicial determination of their ongoing contractual obligations, specifically whether Camden may continue to charge, and whether Plaintiffs and the Class must continue to pay, the Mandatory Service Charges alleged herein. A declaration would resolve those obligations prospectively while the leases remain in effect; it is not limited to determining liability for past damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and those similarly situated, respectfully request that the Court enter judgment against Camden as follows:

A. Certifying this action as a class action under Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Class and Plaintiffs' undersigned attorneys as Class Counsel to represent the Class;

B. For an Order declaring that Camden's conduct violated the laws referenced herein;

C. For an Order finding in favor of Plaintiffs and the Class on all counts asserted herein;

D. For an Order awarding actual, statutory, treble, and punitive damages as applicable;

E. For an Order awarding pre-judgment and post-judgment interest on all amounts awarded;

F. For prospective injunctive relief as pleaded or as the Court may deem proper;

G. For a declaration of the parties' rights and obligations with respect to the mandatory fees alleged herein;

H. For nonduplicative restitution to Plaintiffs and the members of the Class of all monies received or collected from Plaintiffs and the members of the Class and all other forms of equitable relief;

I. For an Order awarding reasonable attorneys' fees and expenses and costs of suit; and

J. For such other and further relief as the Court may deem proper.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: September 4, 2026 /s/ Trenton R. Kashima

Trenton R. Kashima
**BRYSON HARRIS**
**SUCIU DEMAY, PLLC**
19800 MacArthur Blvd., Suite 270
Irvine, CA 92612
Telephone: (212) 946-9389
tkashima@brysonpllc.com

James R. DeMay*
**BRYSON HARRIS**
**SUCIU DEMAY, PLLC**
900 W. Morgan Street
Raleigh, NC 27602
jdemay@brysonpllc.com

Attorneys for Plaintiffs & the Putative Class

**pro hac vice* admission to be sought